# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| EDWARD DRAINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 09 C 2917 |
| | ) | |
| CHAD BAUMAN, Star No. 15110 | ) | |
| UNKNOWN CHICAGO POLICE OFFICERS, | ) | Magistrate Judge Cole |
| and the CITY OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Mr. Draine returned home to his house on Chicago's west side to find his front door broken in, his home ransacked, and several items stolen. And he also found a copy of a search warrant the Chicago police had executed the previous night when no one was home. The police broke into the house with a battering ram, and did not find anything. They had the wrong house, courtesy of an anonymous tipster. Lord Mansfield could not have foreseen heroin dealers and police battering rams when he formulated the "knock before entry" rule nearly a quarter millennium ago, but with this case, his fears are made manifest. Mr. Draine essentially claims that the police broke into his home, "leav[ing] his family within, naked and exposed to thieves and robbers." *Lee v. Gansel*, 98 Eng.Rep. 935, 938 (K.B. 1774). He has sued the defendants for a violation of his Fourth Amendment right under 42 U.S.C. § 1983, as well as charging them with willful and wanton conduct by leaving his home unsecured when their search was over. The defendants have moved for summary judgment on both claims.

# I.
## FACTS

As always, the facts underlying this summary judgment proceeding are drawn from the parties' Local Rule 56.1 submissions. Local Rule 56.1 requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008). The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber*, 527 F.3d at 643. District courts are " 'entitled to expect strict compliance' " with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the Rule's instructions. *Ciomber*, 527 F.3d at 643; *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th Cir.2004). A great deal of the facts in this case are not in dispute. Those that are, concern the condition the police left Mr. Draine's home in – especially his front door – when they left. But the uncertainty surrounding certain of those facts and the undisputed facts relating to the search warrant that preclude the entry of summary judgment.

On March 26, 2009, Officer Bauman was assigned to a police unit that works out of Area 4 of the Chicago Police Department. (*Defendants' Joint Rule 56.1(a)(3) Statement of Facts* ("*Def.St.*"), ¶ 4). He first met with "John Doe" at the Eleventh District police station, which is connected to the Area 4 station, out of which he was working. (*Def.St.,* ¶ 5). A uniformed officer

told him that he had someone who wanted to give him some information. Officer Bauman first said that he couldn't remember whether Doe was under arrest (Bauman Dep., at 26-27), but subsequently admitted that he took Doe "back over to the 11th [District]" and left him "in the care of the officers" there and from that was led to believe that Doe was in fact in police custody. (Bauman Dep., at 51-52). [1]

Doe was not a confidential informant, or CI, who is usually registered as such and regularly supplies information, often for pay. (Bauman Dep. at 11-15). A "John Doe" might be someone who just comes in off the street, or a neighbor, who has never supplied any information. The information from a CI is usually "a lot better" than from a John Doe. (Bauman Dep. at 15). Officer Bauman conceded that one has to be careful in assessing information from a John Doe. (*Def.St.*, Ex. G; *Plaintiff's Rule 56 Response*, Ex. E; Bauman Dep., at 11-12, 20-21). Officer Bauman first said he did not even know the John Doe's name, but later said he might have been told his first name, although he did not recall. But he was clear that he certainly did not know "his exact identity." (Bauman Dep., at 22-23).

So far as he knew, John Doe had never provided information to assist in a drug investigation before. (Bauman Dep. at 35). Doe told Officer Bauman he had been using heroin for more than a year and that he had done heroin the day before. Officer Bauman said he did not recall Doe "acting dope sick." (Bauman Dep. at 34). Doe told Officer Bauman that the day before, March 25th, he

---

[1] The references to Officer Bauman's deposition are to the version in Ex. E to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment. Oddly, although everything that Doe had told Officer Bauman turned out to be false, he never made any attempt to see or talk to Doe following the misdirected search even though he had returned him to the 11th District uniformed officers who brought him to Officer Bauman in the first place. (Bauman Dep. at 52-53).

purchased heroin from a black male he described as being 6'5" tall, about 185 pounds, and of

medium build. (*Def.St.*, ¶¶ 6, 8). The seller was known as Twan. (*Def.St.*, ¶ 7). Doe said he went

inside the abode and Twan got the heroin from a room at the back of the house. (*Def.St.*, ¶ 9). Doe

claimed that he had made purchases at that house before. (*Def.St.*, ¶ 8). He did not, however,

describe the inside of the house or state the amount of drugs he allegedly saw or purchased or how

much he paid for the drugs.[2] After the buy, he said he snorted the heroin and got high. (*Def.St.*, ¶

11).

Officer Bauman could not recall whether Doe knew the address of Twan's house. (Bauman

Dep., at 37). He said it was more likely he identified it as "the first building off of, I think, Keeler

or whatever . . . ." (Bauman Dep., at 37). Officer Bauman showed Doe a picture of 4201 West

Wilcox that appears on the Cook County Assessor's website, and Doe told him that was the house

where he bought the heroin. (*Def.St.*, ¶¶ 11-12). The parties agree that no one named Twan lived

in that house. (*Def.St.*, ¶ 39). Prior to the encounter with Doe, Officer Bauman had no reason to

think that illegal activity of any kind was going on at the place Doe claimed, and he had no

information about anyone called Twan dealing dope in the area. (Bauman Dep., at 22-23, 36). Doe

could not pick Twan from among pictures shown to him. (Bauman Dep., at 42-46).

Following his meeting with Doe, Officer Bauman completed a Complaint for Search

Warrant (*Def.St.*, ¶ 14), which is a preprinted form document, and then drove Doe to meet with a

Circuit Court judge perhaps at a  restaurant near the judge's home since it was after hours.

---

[2]*Compare Spinelli v. United States*, 393 U.S. 410, 425 (1969)(White, J., concurring)("Suppose an informant with whom an officer has had satisfactory experience states that there is gambling equipment in the living room of a specified apartment and describes in detail not only the equipment itself but also the appointments and furnishings in the apartment.").

Ultimately, Bauman could not say exactly where the meeting occurred but it was clear that it was not at the courthouse or the judge's home. The judge issued the search warrant. (*Def.St.*, ¶ 15; Bauman Dep. at 41). The warrant authorized the search of "'Twan' male, black Approximately 25 years old 6'05", 185 pounds" and the premises at "4201 W. Wilcox Single family residence Chicago, Il. County of Cook." (*Def.St.*, ¶ 16; Ex. I). Officer Bauman was to seize "Heroin, to wit, a controlled substance and any documents showing residency, any paraphernalia used in the weighing, cutting, mixing, and packaging of illegal drugs" and "[a]ny money records detailing illegal drug activity." (*Def.St.*, ¶ 17; Ex. I).

Officer Bauman drove past the residence at 4201 W. Wilcox with Doe, who confirmed that it had been the site of the drug deal. (*Def.St.*, ¶ 18). Officer Bauman and a team of other Chicago police officers, including Sergeant John Lucid, executed the search warrant at the residence at approximately 10:45 p.m. (*Def.St.*, ¶ 22). No one was home at the time. The plaintiff, Edward Draine, had left the house between 4:30 and 5:30 p.m. (*Def.St.*, ¶ 20). The police smashed in through the front door with a battering ram and entered the home. (*Def.St.*, ¶ 25). As he entered the dwelling, Officer Bauman noticed a television in the front room. (*Def.St.*, ¶ 27). He and the other police officers searched the entire residence, looking through drawers and pulling clothes out of closets in an effort to find containers or anything that might contain drugs. (*Def.St.*, ¶ 28). Their efforts were fruitless; no narcotics, large amounts of cash, or any other indicia of illegal drug selling were found anywhere in the home. (*Def.St.*, ¶ 29). Nor did they find anyone in the house, including "Twan." (R. 29). The exercise took between 30 minutes to an hour. (*Def.St.*, ¶ 30).

As the police left, Sergeant Lucid left their "calling card" – a copy of the search warrant. (*Def.St.*, ¶ 31). Officer Bauman testified that he considered the damage they had done to the front

5

door to be "fairly minimal" or "not . . . tremendous," when compared to some of the other doors they had broken through when executing warrants. (*Def.St.*, Ex. G, Bauman Dep., at 76). At one point in his deposition, Officer Bauman said that he simply closed the door when they left. (Bauman Dep., at 76). He said he didn't remember trying to twist the door knob to see if it locked. (Bauman Dep., at 79). Then, he said he did attempt to twist the "bottom knob lock;" he "checked, it wouldn't twist and then gave a push to the door." (Bauman Dep., at 79-80). Although the police took a photograph of the door before they battered it (*Def.St.*, Ex. K), they took no photos of the damaged door. (Bauman Dep., at 80). Officer Bauman was aware that the house was in a high crime area. (*Def.St.*, ¶ 33). He also allowed that the City of Chicago has a claims department he could have notified to fix the door after the search and secure the home. (Bauman Dep., at 83).

Mr. Draine's daughter was the first to return home about 11:45 p.m. When she did, she found the front door open, and the house in disarray. (*Def.St.*, ¶¶ 42-43). The vents had been removed, papers were thrown all around, and the television that had been in the front room was missing. (*Def.St.*, ¶ 43). Ms. Magee attempted to close the damaged front door when she returned home but was unable to do so. (*Def.St.*, ¶ 44). The door was off its hinges and the door frame was cracked. (*Plaintiff's Rule 56 Response*, ¶ 6). When Mr. Draine returned home with his girlfriend, he saw that clothes had been thrown on the floor of his house, couches had been rearranged, and the home appeared as if it had been "trashed." (*Def.St.*, ¶ 45). A fair number of items had been stolen: multiple work tools, music equipment, bicycles, jewelry, clothing, and televisions. (*Def.St.*, ¶ 46). The City did eventually send a contractor to fix the door several days later; there had been about $1200 worth of damage. (*Plaintiff's Rule 56 Response*, ¶ 6).

## II.
## ANALYSIS

### A.
### Summary Judgment

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the nonmoving party's evidence "'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999). Credibility determination must be left for the fact-finder. *Hunt*, 526 U.S. at 552.

But this favor toward the nonmoving party does not extend to drawing "[i]nferences that are supported by only speculation or conjecture." *Fischer v. Avanade, Inc.,* 519 F.3d 393, 401 (7th Cir.2008) (citation omitted). The nonmoving party "must do more than raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 628 (7th Cir.2006) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Where the nonmoving party bears the burden of proof at trial, he must present specific facts showing a genuine issue to survive summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986); *Ortiz v. John O. Butler Co.,* 94 F.3d 1121, 1124 (7th Cir.1996)("If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party."). A genuine issue of material fact exists, precluding summary judgment, "only if sufficient evidence favoring the

nonmoving party exists to permit a jury to return a verdict for that party." *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir.2007) (citation omitted).

## B.
### The Unlawful Search Claim

#### 1.

The defendants have moved for summary judgment on Mr. Draine's unlawful search claim, arguing that Officer Bauman "[r]easonably [r]elied on John Doe's [r]epresentations that an [i]ndividual [n]amed 'Twan' was [s]elling [h]eroin at 4201 West Wilcox." (Defendants' Joint Memorandum, at 3). This argument, which spans one-and-a-half pages in the defendants' memorandum in support of their Motion for Summary Judgment is based exclusively on a single case, which is discussed *infra* at 11.

When a search is authorized by a warrant, a court gives deference to the issuing judge's conclusion that probable cause was established. *United States v. Sims*, 551 F.3d 640, 643-44 (7th Cir. 2008); *United States v. Garcia*, 528 F.3d 481, 485 (7th Cir.2008). But that deference is neither abject, nor "boundless."*United States v. Leon*, 468 U.S. 897, 923 (1984). "We defer to the issuing judge's initial probable cause finding if there is 'substantial evidence in the record' that supports his decision." *Sims*, 551 F.3d at 644. A search warrant affidavit establishes probable cause when "'it sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *Sims*, 551 F.3d at 644.

The judge issuing the warrant must simply make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that evidence of a crime will be found in a particular place. *Id.* at 644; *United States v. Koerth*, 312 F.3d

862, 866 (7ᵗʰ Cir. 2002). But, the judge "may not solely rely upon 'conclusory allegations' or a 'bare bones' affidavit when issuing a warrant." *Sims*, 551 F.3d at 644; *United States v. Leon*, 468 U.S. 897, 915 (1984). And that's what we have here: a "bare bones" application for a warrant.

When a warrant affidavit is supported by an informant's tip, the court's inquiry into probable cause encompasses several factors, including: (1) the extent to which the police have corroborated the informant's statements; (2) the degree to which the informant has acquired knowledge of the events through firsthand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and the police officer's application for the search warrant. *United States v. Sims*, 551 F.3d at 664; *United States v. Jones*, 208 F.3d 603, 609 (7ᵗʰ Cir.2000). The status of the individual reporting to the police is also significant in determining the credibility of the information he provides. Identified eyewitnesses and victims are deemed reliable, *Pasiewicz v. Lake County Forest Preserve Dist.*, 270 F.3d 520, 524 (7ᵗʰ Cir. 2001), and so too may be confidential informants, *see* 2. LaFave, Search and Seizure, §3.4(a) at 218, *et seq.*, who stand on a very different footing than an unidentified tipster like "the John Doe," with whom the policed have had no prior involvement. *Cf. United States v. Hammond*, 351 F.3d 765 (6th Cir.2003) (where informant of unknown reliability told police that the defendant was growing marijuana on his property and police only confirmed that defendant lived on road claimed by the informant and that there was a gate across his property as claimed, the warrant was deemed to have been improvidently granted and not to have been supported by probable cause). Even Officer Bauman conceded that with the kind of unidentified individual with whom he was dealing, one had to be very careful. (*Def.St.*, Ex. G; *Plaintiff's Rule 56 Response*, Ex. E; Bauman Dep., at 11-12, 20-21).

The court also considers whether the informant personally appeared and presented an affidavit or testified before the judge, thus giving him at least some opportunity to evaluate the informant's knowledge, demeanor, and sincerity. *Sims*, 551 F.3d at 644; *United States v. Lloyd*, 71 F.3d 1256, 1263 (7th Cir.1995). A deficiency in one of these factors may be compensated for by a strong showing in another or by some other indication of reliability. *United States v. Dismuke*, 593 F.3d 582, 587 (7th Cir. 2010); *United States v. Brack*, 188 F.3d 748, 756 (7th Cir.1999). But an appearance before a judge does not automatically mean that an otherwise inadequate warrant automatically satisfies the probable cause requirement, and demeanor has limited utility, even in the less hurried setting of a trial. *United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998)(Posner, C.J.)("Judges fool themselves if they think they can infer sincerity from rhetoric and demeanor" and "weepy" performances.).

## 2.

Here are the facts on which the Motion for Summary Judgment must be based. We know from the application for the search warrant in this case and from the evidence presented by the parties that the informant's identity was unknown – he was a real John Doe – who had not provided any information, reliable or otherwise, in the past. (*See* Defendants' Joint Rule 56.1(a)(3) Statement of Uncontested Facts, ¶¶ 4-12; Exs. H and I). That's not a death knell, though. Since there must be a first time for everything, including ratting out fellow criminals, the lack of a proven track record will not preclude a finding of probable cause if there are other indicia of the reliability of the information. *Guzman v. City of Chicago*, 565 F.3d 393, 396 (7th Cir. 2009); *Edwards*, *supra*. Here there were none.

John Doe identified "Twan" as a black male standing 6'5" tall and weighing 165 pounds. Officer Bauman said in his complaint for search warrant that Doe told him that he met "Twan" on March 26, 2009, "*at 4201 W.Wilcox*" to buy heroin. (*Defs.St.*, ¶ 15; Ex. H)(Emphasis supplied). That statement was not accurate since John Doe had not given Officer Bauman a specific address. He merely referred to an area and then identified the single picture Officer Bauman obtained from the Assessor's office website of the building that seemed to correspond to Doe's general designation. But it was more than inaccurate; it was misleading. Knowledge of the exact address was at least consistent with Doe's claim that he had ben buying drugs from Twan for a year. Absence of that knowledge made Doe's story less credible. The misstatement takes on even greater significance when considered in the context of Doe's identification of the picture from the Assessor's website. That tended to show the judge that there was corroboration for Doe's (non-existent) specification of 4201 West Wilcox as the place where he bought drugs from Twan.

A further misleading aspect of the complaint for search warrant is the statement that "for the sake of personal safety," Officer Bauman was referring to the individual who purchased the heroin from Twan as "J. Doe." The statement is certainly susceptible of being read as representing that the police knew Doe's identity, but chose not to use his name in order to protect him. That was misleading since Officer Bauman said he did not know Doe's true identity. But the credibility to be accorded by the judge to Doe's allegations was in part a function of whether they were being made by someone known to the police – and thus perhaps answerable for falsehoods - or someone whose identity was unknown and thus might not have the same compunctions about lying and using them as a cat's paw for some personal vendetta.

Although not in the nature of an affirmative misrepresentation, Officer Bauman, a highly experienced police officer as he said in his complaint for search warrant, withheld from the judge Doe's inability to select Twan from a photo spread, and more importantly the fact that the police had no information remotely suggesting that illegal activity of any kind was going on at the Wilcox address. Fairly viewed, the scant complaint for search warrant depended entirely on the credibility of Doe, whose identity was unknown to the police, who had no prior track record as an informant, and whose story was not only unsupported, but undercut by the facts known to Officer Bauman but not conveyed to the judge.

Doe's "admitted" criminality does not in itself establish unreliability; if it did, very little police work would be accomplished, and the rule that a defendant in a criminal case can be convicted on the uncorroborated testimony of a convicted felon could not exist. But the veracity of an informant's information must be bolstered in some other way, such as corroboration through police work. *Illinois v. Gates,* 462 U.S. 213, 241 (1983); *United States v. Mitten,* 592 F.3d 767, 773-74 (7th Cir. 2010); *United States v. Taylor,* 471 F.3d 832, 840 (7th Cir. 2006); *Hammond,* 351 F.3d at 772. Here, there was no corroboration of anything Doe said, with the arguable exception of his identification of the picture of the alleged site of the drug sale taken from a public website. But that is not independent corroboration, it is merely self-validation. And even that was questionable and inconsistent with the fact that Officer Bauman had no information of any sort that there had been drug or other illegal activity in the Wilcox Street house.

The circumstances of the informant's contact with police are important because they allow the issuing judge. He may have been arrested and attempted to curry favor with the police, although that would not necessarily undermine his credibility because his reward would not likely come until

the information proved accurate. *See United States v. Mitten*, 592 F.3d 767, 774 (7th Cir. 2010). Perhaps he was not an arrestee, but a rival drug dealer or an angry customer, *see United States v. Bell*, 585 F.3d 1045, 1050 (7th Cir. 2009), or just a guy with a private grudge. In this case, the judge was not told of the circumstances under which Officer Bauman came to meet Doe, even though those circumstances strongly suggested that Doe was in some sort of police custody by officers in the 11th District. Rather than telling the judge what had occurred, the complaint for warrant benignly said that Officer Bauman "met" Doe, who proceeded to relate to him his involvement with Twan. What was conveyed to the judge subtly distorted the reality of what had occurred, thereby concealing the possible existence of a motive that could have caused the judge to question Doe's credibility. While the absence of information relating to motive might be insignificant if other evidence established that the informant was reliable, *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006), there is nothing like that here.

The warrant application in the *United States v. Mitten*, 592 F.3d 767, 771-73 (7th Cir. 2010) was six pages and spoke of a previous drug arrest of the suspect, one confidential informant identifying the suspect as a dealer from a photo and accurately describing his vehicle, a second confidential informant stating that he had purchased drugs from the same location as the other informant, a second drug arrest of the suspect, a successful search of the suspect's mother's house, and police surveillance of the suspect. By way of comparison, warrant applications that have been approved by the courts provided far more information than did Officer Bauman's. *Compare United States v. Laws*, 808 F.2d 92 (D.C.Cir.1986) (informant gave personal knowledge regarding two defendants' drug operation at motel; sufficient corroboration where police corroborated named persons registered in room stated by informant, as police also knew one defendant had a prior drug

conviction and that this motel commonly used by drug dealers). Officer Bauman's complaint for search warrant does not begin to measure up to what occurred in these cases.

Even in cases where some corroboration has occurred, the warrants do not necessarily pass muster where the corroboration only went to innocent or innocuous details. In those settings, courts have not hesitated to find an absence of probable cause.[3] We have previously discussed *United States v. Hammond*, 351 F.3d at 765. *United States v. Leake*, 998 F.2d 1359 (6th Cir.1993) is also instructive. There, the police received an anonymous phone call stating that he had seen 300 lbs. of marijuana on the defendant's property and that he recognized it as marijuana from its odor, with which he was familiar. The court held that mere corroboration of the location of the described house and other related details were insufficient.

Numerous other cases show that the claimed corroboration by Doe of the building where Twan was supposedly selling drugs was not enough to establish probable cause. *See e.g., United States v. Mendonsa*, 989 F.2d 366 (9th Cir.1993) ("mere confirmation of innocent static details is insufficient," as "fact that a suspect lives at a particular location or drives a particular car does not provide any indication of criminal activity"); *United States v. Gibson*, 928 F.2d 250 (8th Cir.1991) (where anonymous informant said he saw drugs in house, mere corroboration of "several innocent details" regarding defendant's description and his ownership of certain dog and vehicles insufficient); *Commonwealth v. Borges*, 395 Mass. 788, 482 N.E.2d 314 (1985)(first-time informant said defendant seen with heroin for sale at bar; corroboration that defendant was there was insufficient to establish probable cause to arrest).

---

[3] Of course, detail, itself, is not conclusive, for "'[u]ncorroborated detail of any amount hardly supports an inference that the informer is trustworthy. For even a wealth of detail is easily fabricated.'" 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment, 169, n. 296 (4th ed. 2004).

14

Officer Bauman's complaint for search warrant also brings to mind the application found wanting in *Koerth*, in terms of quality and quantity of information. The *Koerth* warrant application stated that:

> On Wednesday, Aug. 30, 2000, a search warrant was executed at 806 Ruff Pl., Bloomer, Wis., which led to the seizure of marijuana, methamphetamine, and U.S. Currency. Investigation revealed that the marijuana and methamphetamine were purchased from a white male, known as Lonnie, who resides at 2344 195th Ave.
>
> Abraham Savage, who is believed to be a reliable source, indicated that he was at Lonnie's on Thursday, Aug. 29, 2000, and witnessed a large amount of marijuana. Savage stated he believed there was approximately 150-200 pounds of marijuana at the residence, as well as approximately two pounds of methamphetamine, a large bag of cocaine, and $30,000 in U.S. currency.
>
> Savage has purchased from Lonnie in the past and that [sic] Lonnie is a member of the Iron Wings Motorcycle Club. Savage has also seen numerous firearms in the residence to include [sic] fully automatic weapons. Savage also indicated that Lonnie "would not be afraid to shoot" and that "law enforcement would have to shoot it out with him."

312 F.3d at 867. The informant in *Koerth* was not anonymous – here, John Doe was functionally anonymous since Officer Bauman did not know his identity – and at least the officer said he believed him to be reliable – not that that would mean much. *Id.* at 867 (such characterizations as "reliable source" "standing alone" "without any supporting factual information, merit absolutely no weight...."); *United States v. Brack,* 188 F.3d 748, 755 (7th Cir.1999). What concerned the court was the fact the affidavit did not explain the extent to which the informant had previously provided information to the officers, that the officer did not present the informant to testify before the warrant-issuing judge, and the officer did not take any steps to corroborate the informant's statements. *Id.* at 867-68.

Officer Bauman's complaint for search warrant also provides no inkling into the reliability of "the John Doe," as the City's brief refers to him. He had no track record and Officer Bauman did not even know his identity. *See United States v. Bell*, 585 F.3d 1045, 1049-50 (7th Cir. 2009)(affidavit provided no information to establish informant's credibility). Nor have the defendants offered any evidence that the judge who issued the warrant knew anymore about Doe than did Officer Bauman. In fact, as discussed earlier, the judge knew a lot less because of the way in which the complaint for the search warrant was written. And, Officer Bauman's information – or more precisely his lack of any information – of any illegal activity at the Wilcox address certainly did not bolster in any way Doe's tale.

Officer Bauman prepared the complaint for search warrant on a partially preprinted form, which recites that Officer Bauman and John Doe appeared before the judge. (*Defs.St.* Ex. H; Bauman Dep. at 31). Paragraph 15 of the defendants' Joint Rule 56(a)(3) statement says that the judge who issued the search warrant did so "after interviewing the John Doe."[4] The interview by the judge who issued the complaint seemingly took place in a police car, which may or may not have been a "covert vehicle." (Bauman Dep., at 47-48). Officer Bauman did not remember whether the judge got into the car or stood on the sidewalk or even whether he was in the car. He was clear, however, that he did not hear any of what transpired between the judge and Doe. (Bauman Dep., at 47-49). Thus, on the present record, it is impossible to know what questions the judge asked during the "interview " of John Doe.

---

[4] The Plaintiff's Rule 56.1 Response to the Defendants' Statement of Facts does not dispute the allegations in Paragraph 15, or to any of the other statements of fact in Paragraphs 1 through 31. (See Plaintiff's Rule 56.1 Response to Defendants' Statement of Facts at 1, ¶¶1-31).

The defendants rely exclusively on *United States v. Lloyd*, 71 F.3d 1256 (7th Cir. 1995), which they characterize as "controlling" the resolution of this motion. But the informant in *Lloyd* simply cannot be compared to John Doe, and the warrant application in *Lloyd* was far more informative than the one here, especially in terms of indicia of reliability. First, and critically, the informant in *Lloyd* was a "CI," not a "John Doe," whose identity the police did not even know – or at least Officer Bauman did not know it and made no attempt to find out. Thus, unlike *Lloyd*, the informant here had no measure of proven reliability based on past performance. *Cf. Hammond*, 351 F.3d at 772 ("'where a known person, named to the magistrate, to whose reliability an officer attests with some detail, states that he has seen a particular crime and particular evidence, in the recent past, a neutral and detached magistrate may believe that evidence of a crime will be found.'").

The officer in *Lloyd* then drove to the location with the CI and observed a building matching the description on the corner the CI had indicated. *Id.* He had the CI point out the window of the apartment. *Id.* The tip was further corroborated when the CI selected the suspect from an array of photos. *Id.* The officer then ran a records search and discovered that the suspect had been convicted of second degree murder, aggravated burglary, and unlawful use of a weapon on two occasions. *Id.* Here, Doe could not identify Twan from a photo spread of known narcotics dealers and Officer Bauman had no information that there was no information that there was drug activity going on at Twan's house.

Among other things, the court in *Lloyd* found significant the detail the CI provided, *id.* at 1263, which was far more than Doe provided in this case. Here, Doe did not even know the suspect's name, calling him "Twan." The CI in *Lloyd* knew the suspect's full name and, more importantly, had a pre-existing relationship with him through gang association. Also, unlike the

informant in *Lloyd*, John Doe did not describe the building in any detail. Nor did he describe the interior of Twan's house, although he claimed to have been repeatedly there. The best he could say was that Twan brought the drugs from a room in the rear of the residence. (*Defs.St.* ¶9). But that does not tell anyone anything as there are rooms in the rear of all houses, unless they are built horizontally. This is less detail than the CI provided in *Lloyd*. Finally, Doe only identified the building after being shown a single photograph by Officer Bauman, that Officer Bauman selected off a public website that seemed to correspond to the area described by Doe. That selection proved absolutely nothing.

Another factor the court in *Lloyd* found significant was the officer's corroboration of the information. He drove past the house with the CI. He performed a records check on the suspect. Officer Bauman, conversely, made no effort to corroborate John Doe's story, which he admittedly could have done by conducting surveillance on the house to see who came and went and if the traffic patterns were suggestive of drug activity. In fact, he said that it was his practice not to do surveillance to verify what someone like Doe was claiming. Nor did he attempt to make a controlled buy at the location identified by John Doe. (Bauman Dep. at 61-65). Finally, he conceded that he made no effort to determine who lived at the Wilcox address even though that information was readily available through Accurint, a computer website accessible to Officer Bauman, to which the City subscribes. There were, as he conceded, other relevant, and readily available databases from which he could have obtained relevant information, but he did not do so, (Bauman Dep. at 64-67), even though "'corroboration through other sources of information [could have] reduced the chances of a reckless or prevaricating tale'...." *Illinois v. Gates,* 462 U.S. 213, 244-245 (1983).

The information supporting the warrant in this case fell far short of the information in *Lloyd*.

At bottom, the warrant application consisted of an accusation, not by a confidential informant with a proven track record, but by a person whose name was unknown either to the police or the issuing judge. Moreover, Officer Bauman's facile attempts to corroborate the story tended to show that Doe was not credible, since there was no information known to the police to suggest that there was any illegal activity going on at the Wilcox address or that someone known as Twan had been selling drugs out of the Wilcox house for at least a year. The only factor shared by the two cases is that the person providing information to the police appeared before the judge issuing the warrant.

But one factor alone is not dispositive. *Dismuke*, 593 F.3d at 587; *Brack*, 188 F.3d at 756. The totality of the circumstances – and that is what is important – falls short of *Lloyd*. We do not know what the judge asked of Doe and thus it is impossible to know what, if any, significance can be attached to the appearance, which could well have been perfunctory at best. *Compare Sims*, 551 F.3d at 644 -645 (the issuing judge asked the informant, whose identity the police knew and who was the drug dealer's girlfriend, whether: (1) she was submitting her affidavit as "John Doe" in fear of Sims retaliating against her; and (2) whether all information provided in the affidavit was true and correct). And finally, unlike the application for a search warrant in *Lloyd*, Officer Bauman's complaint for search warrant was misleading for the reasons discussed earlier. Considering all the relevant factors, the defendants have failed to demonstrate that the application for the search warrant in this case established probable cause.

## C.
### The Qualified Immunity Argument

Of course, that is not the end of the inquiry. A police officer might nonetheless be entitled to qualified immunity. The City's brief points out the twofold nature of the inquiry: First was there

a constitutional violation? (Defendants' Memorandum at 6). If the answer is affirmative, the court must determine whether the constitutional right at issue was clearly established at the time of the violation and whether the law was clear in relation to the specific facts confronting the officer at the time he acted. *Id. See Pearson v. Callahan,* – U.S. –, 129 S.Ct. 808, 816 (2009); *Saucier v. Katz,* 533 U.S. 194, 201 (2001); *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).[5] The defendants' brief, however, only addressed the question of whether there was a constitutional violation. Concluding that there had been none, the brief found it "unnecessary" to reach the question of whether the constitutional standards or right at issue in this case were not clearly established at the time of the officers' entry into the plaintiff's home. *See Defendants' Joint Memorandum in Support of Summary Judgment,* at 6-7 ("Plaintiff cannot . . . establish that his Fourth Amendment rights were violated through the execution of the issued search warrant by Officer Bauman."). In resolving the qualified immunity question, it is important to keep in mind the very precise nature of the defendants' argument.

Although the plaintiff bears the burden of establishing that there has been a constitutional violation and that the constitutional standards were clearly established at the time of the violation, *Mannoia v. Farrow,* 476 F.3d 453, 457 (7th Cir .2007), in the context of the summary judgment motion, the defendants have the initial burden of demonstrating that there is no genuine issue of fact as to that question and that they are entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323-24; *Delta Consulting Group, Inc. v. R. Randle Const., Inc.,* 554 F.3d 1133, 1137 (7th Cir. 2009).

---

[5] In *Pearson,* 129 S.Ct. at 818-22, the Court held that the two-part inquiry mandated in *Saucier,* 533 U.S. at 201 need not be performed in *Saucier's* prescribed order.

Based upon the defendants' narrow, qualified immunity argument in their supporting memorandum, it was enough for plaintiff to show that his Fourth Amendment rights were violated. Taking, as we must, the facts in the light most favorable to the plaintiff, *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008), the plaintiff has done that. *Id.* at 639-40 (applying initial Fourth Amendment analysis to qualified immunity analysis). Significantly, the defendants' supporting memorandum did not argue in the alternative that even if there was no probable cause for the issuance of the warrant, Officer Bauman was entitled to qualified immunity because he acted in good faith. *See Leon,* 468 U.S. at 923; *United States v. Mykytiuk*, 402 F.3d 773, 777 (7th Cir. 2005).

The defendants' failure to have based their argument for qualified immunity on anything beyond the claimed non-existence of a Fourth Amendment violation in their supporting memorandum constituted a waiver of the qualified immunity argument to the extent it rested on some other theory. *See Ruffino v. Sheahan,* 218 F.3d 697, 700 (7th Cir. 2000)(defendant had to raise second part of *Saucier* inquiry). That omission is not to be ignored, for, as the Seventh Circuit has stressed time and again, it is not the job of trial judges to research and construct legal arguments available to a party. *Tyler v. Runyon,* 70 F.3d 458, 466 (7th Cir.1995); *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 230 (7th Cir. 1992). So important are these principles to the adversary system and to basic institutional considerations that they apply even where constitutional issues are involved. *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.1991).

Quite apart from any question of waiver resulting from failure to properly raise the issue, the plaintiff has offered enough that the defendants cannot be found entitled to qualified immunity on the instant motion. It is unnecessary for a plaintiff to offer a case that is directly on point to defeat an assertion of qualified immunity, *Hope v. Pelzer,* 536 U.S. 730, 741 (2002), or even one that is

"fundamentally similar." *T.E. v. Grindle*, – F.3d –, –, 2010 WL 938047, *5 (7th Cir. 2010). The

Seventh Circuit recently explained what is required in *Estate of Escobedo v. Bender*, – F.3d –, –,

2010 WL 1267297, *9 (7th Cir. 2010), drawing from the Supreme Court's decision in *Hope*:

> . . . even where there are notable factual distinctions between the precedents relied
> on and the case before the Court, if the prior decisions gave reasonable warning that
> the conduct at issue violated constitutional rights they can demonstrate clearly
> established law. While Fourth Amendment inquiries are fact intensive, officials can
> still be on notice that their conduct violates established law even in novel factual
> circumstances. Accordingly, the salient question here is not whether there is a prior
> case identical to the [plaintiff's] current claim but whether the state of the law at the
> relevant time gave the Defendants fair warning that their treatment of [plaintiff] was
> unconstitutional.

*Escobedo*, 2010 WL 1267297, *9 (citations and quotations omitted). Here, the factors *Lloyd* found

significant – in a case decided fifteen years ago – and the analysis of those factors, gave fair warning

that plaintiff's Fourth Amendment rights were violated by Officer Bauman.

Another product of the defendants' failure to have developed their qualified immunity

argument in their memorandum in support of the motion for summary judgment is the fact that they

completely ignored, until their reply brief, the analysis applied in cases like this where a police

officer is acting pursuant to a warrant. And even then, the argument received barely a passing nod.

(Reply at 6). In *Malley v. Briggs*, 475 U.S. 335 (1986), the "'Supreme Court ... lent support to the

notion that qualified immunity under section 1983 may be equated with the good-faith exception to

the exclusionary rule in the context of arrest and search warrants.'" *Wollin v. Gondert*, 192 F.3d 616,

624 (7th Cir. 1999). And so, qualified immunity in a warrant case can rest on an inquiry into whether

a reasonably well-trained officer would have known that the search was illegal despite the judge's

authorization. *Malley*, 475 U.S. at 345; *United States v. Leon*, 468 U.S. 897, 924 (1984); *Wollin*,

192 F.3d at 624. The Seventh Circuit has explained the analysis in this way in the exclusionary rule context:

> Police officers in effecting searches are charged with a knowledge of well-established legal principles as well as an ability to apply the facts of a particular situation to these principles. When evidence has been obtained pursuant to a subsequently invalidated search warrant, we will exercise our discretion and admit the evidence only if we are convinced, after review, it is appropriate to do so pursuant to *Leon's* exception to the exclusionary rule. That is to say, we will admit the evidence unless: (1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.

*United States v. Harju*, 466 F.3d 602, 607 (7th Cir. 2006)(citations omitted).

Because of the narrowness of the qualified immunity argument in the memorandum in support of the motion for summary judgment – not mentioning *Malley* and the associated principles until the reply brief – the plaintiff had no chance to fairly meet the argument, terse as it was. (*Reply* at 6). In any event, the question is one of law, and the record supports the conclusion that the warrant application was so lacking in indicia of probable cause so as to render official belief in its existence unreasonable. *Malley*, 475 U.S. at 344.

The belatedly expanded argument for qualified immunity in the reply brief merely lists the same factors the opening memorandum listed in support of the argument that there had been no Fourth Amendment violation. Those contentions have been discussed earlier and found wanting. At bottom, all Officer Bauman knew was that an unidentified person, who was in some sort of custody of 11th District uniformed officers, claimed to have bought drugs from a person, whose real name he did not know, and from a house whose address he could not specify, although he claimed to have been a customer of the seller operating out of that house for more than a year. This story was

23

not merely uncorroborated, it was actually undercut by the absence of any information known to the police remotely tending to show narcotics or other illegal activity by anyone out of a house on Wilcox Street. And, John Doe could not pick Twan out of a photo spread of known narcotics dealers in the area.

Officer Bauman consciously chose not to consult any of the available databases that might have provided information to corroborate or refute Doe's story.  *See supra* at 18.  Was this a tale spun for the occasion or was it an honest disclosure about drug dealing at the house on Wilcox Street?  No reasonable police officer cold have concluded based on the information that Officer Bauman had that there was a fair probability either that Doe was credible or his information reliable. The cases discussing reliability of informants and corroboration of their information show that that Officer Bauman ought to have known his application did not establish probable cause.

### D.
### The Willful and Wanton Claim

Count II of the complaint alleges that Officer Bauman acted willfully and wantonly in leaving the plaintiff's home unsecured after the police completed their search. That degree of culpability is what is required to avoid application of the Illinois Tort Immunity Act, which shields public employees from liability for actions committed "in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202; *Chelios v. Heavener*, 520 F.3d 678, 692-93 (7th Cir. 2008). A police officer is not guilty of willful or wanton conduct unless he acted with "actual or deliberate intention to harm or with an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210; *Chelios*, 520 F.3d at 693.

The defendants argue that summary judgment is appropriate because "Officer Bauman made efforts to ensure that the front door to Plaintiff's was closed and locked before he and the rest of the search team left." (*Defendants' Joint Memorandum in Support of Summary Judgment*, at 7). The question here is not whether he made "efforts," it is what efforts were made, and whether those efforts were adequate under the circumstances. Or, were Officer Bauman and his colleagues indifferent to the safety of Mr. Draine's property? In short, the argument that Officer Bauman made "efforts" is as uninformative as is the statement that Mr. Draine's front door wasn't damaged as badly as some others he'd broken down. It tells us nothing. It bears repeating that although the police took photographs of the plaintiff's door before they broke it in, they did not take any photos of the damage they did or of the State of things after they used the battering ram to gain entry or as they were leaving. That unexplained failure, coupled with the fact that pictures were taken before the entry, is a fact that can be considered in the context of a summary judgment proceeding or trial. It is circumstantial, to be sure, but circumstantial evidence may be more certain, satisfying and persuasive than direct evidence. *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960); *Branion v. Gramly*, 855 F.2d 1256, 1258 (7th Cir. 1988)("The evidence was circumstantial, but what circumstances!").

Whether an officer acted wantonly "is normally a question of fact to be determined by the jury." *Chelios*, 520 F.3d at 693; *Carter v. Simpson*, 328 F.3d 948, 951 (7th Cir. 2003). That is certainly the case here, where a jury will have to determine, first, exactly what Officer Bauman's "efforts" were, and second, whether they were sufficient, especially given his concession that the residence was in a high crime area. It will, in the first instance, be a question of Officer Bauman's credibility. And that is simply not a matter for summary judgment. *Hunt*, 526 U.S. at 552;

25

*Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007). His testimony regarding how he left the

scene was equivocal and evolved a bit as his deposition wore on. First, he said that he simply closed

the door behind him:

> Q: I believe in your Interrogatory Answers you said that you just simply closed the
> front door behind you; is that correct?
>
> A: That's correct, I closed the door, the main door.

(Bauman Dep., at 76). He did not even try to twist the door knob:

> A: I don't remember trying to twist the knob because we wouldn't have been able to
> lock it from the outside anyway. If you would have locked it from the inside, then
> you would be stuck inside. So we would just close the door and try to use the bottom
> lock.

(Bauman Dep., at 78-79). He said he did not recall inspecting the door jamb for damage before he

left. (Bauman Dep., at 79). Then he said that he did twist the door knob to try the lock:

> A: The bottom lock, I mean it would have already been engaged from the inside
> unlocked. We pulled it closed, I then checked, it wouldn't twist and then gave a push
> to the door.

(Bauman Dep., at 80). So perhaps he checked the door knob or maybe he didn't; it's not entirely

clear from his deposition testimony. It's a credibility question for the jury.

And it might not matter if he did. If a jury believes Officer Bauman checked to see if the

door knob twisted, the question remains whether that would be enough. A door knob that is locked

might still not present much of a secure barrier when it is apparent that the door, door frame, and

door jamb are damaged – if it was apparent. The door had been smashed in to allow the police to

gain entry, after all. That means that even if the door was "closed," it was, for all practical purposes,

nothing more than a piece of wood leaning against the door frame. So what if the door knob didn't

turn? How secure could the door have been afterward if nothing was done to repair it?

The defendants' reply brief argues that the outer door, a screen door with a metal grate, "was not itself breached during the execution of the search warrant . . . ." (*Reply Brief*, at 8). Of course, waiting to raise such a point until the reply brief is too late. *United Sates v. Wescott*, 576 F.3d 347, 354 (7th Cir. 2009)("Arguments raised for the first time in a reply brief are waived."); *Porco v. Trustees of Indiana University*, 453 F.3d 390, 395 (7th Cir.2006)(same). Moreover, there is nothing in defendants' statement of facts regarding the condition of the outer door when the search was concluded. So, it is not a "fact" that need be considered in this summary judgment proceeding. Local Rule 56.1(a)(3) requires that a movant set forth all facts that entitle him to summary judgment and the cases are uniform in holding that a court need not, and should not, look beyond the LR 56 statement. *See F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005)(court properly disregarded facts and evidence not referenced in 56.1 submission); *Ammons v. Aramark Unif. Serv., Inc.*, 368 F.3d 809, 817 (holding that district court entitled to expect strict compliance with Rule 56.1, not merely substantial compliance). Perhaps it was damaged or left ajar. Officer Bauman testified only that he "closed the door, the *main* door." (*Bauman Dep.*, at 76). Perhaps the damage to the main door was easily visible through the outer door, making Mr. Draine's home an enticing target. After all, as Officer Bauman noted in his deposition, this was a high crime area.

There were other steps Officer Bauman might have taken as well, steps he was aware of, and steps that appear to have been standard procedure:

> Q: Did you make any kind of call to anyone from the City of Chicago to get out to this place to try and make some repairs on the front door?
>
>             *        *        *
>
> A: No, I would not.

27

Q: Are you aware of any other officer making that call before you left or shortly after you left that evening?

A: Not that evening, no.

Q: Is there in fact a unit or department in the police department or with the City of Chicago that comes out and repairs damage done in a search warrant?

A: There are a sort of claims department that if they are notified they would come out and fix doors or whatever, that I'm aware of.

(Bauman Dep., at 82-83). Yet, no one contacted that department or tried to contact any of the residents of the home to let them know what had happened. (Bauman Dep., at 85). All they did was leave a copy of the warrant – hardly an impediment to thieves and of no value in getting the "department" to make the obviously needed repairs to the door. And finally, there is the curious fact that Officer Bauman and his colleagues failed to take pictures of the door as they were leaving, even though they took care to take pictures of the door before they entered. The inference the jury can draw, if he chooses to, is as obvious as it is negative.

These are some of the facts that will inform the jury's analysis of Officer Bauman's credibility and whether his conduct was willful and wanton. It is simply not an appropriate matter for summary judgment given the record.

### E.
### The Respondiat Superior Claim

Finally, the City argues that it is entitled to summary judgment on Mr. Draine's *respondiat superior* liability claims against it under the Illinois Tort Immunity Act. 745 ILCS 10/2-109. Under the Tort Immunity Act, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." As the City's argument hinges on the

success of Officer Bauman's summary judgment arguments, and those have failed, the City's argument fails as well.

## CONCLUSION

To summarize the undisputed facts is to decide the motion for summary judgment: an individual whose identity was unknown to Officer Bauman, and who had never before acted as an informant, confidential or otherwise, and who was under some sort of police control in the 11th District, claimed to have purchased heroin within the last 24 hours and on a number of previous occasions over the past year from a man whom he only identified as "Twan." He described Twan, but did not know the address of Twan's house, even though he said he had been there repeatedly to buy drugs. He did not give any meaningful particulars about the inside of the house, and he could not identify Twan from a photo array of known or suspected drug dealers. Officer Bauman had no information that a "Twan" was involved in narcotics activity in that area, and perhaps more importantly, Officer Bauman had no information that illegal conduct of any sort was going on at or near the place the John Doe claimed he had repeatedly purchased drugs. The best Doe could do was to say that a single picture of a building selected by Officer Bauman from a public website was Twan's home.

Based on these facts, the defendants' argument that the warrant they obtained was supported by probable cause is unsustainable. Equally unpersuasive is the contention that under these facts Officer Bauman should not have known that the search was illegal despite the judge's authorization. And, the defendants have failed to demonstrate that there are no issues of material fact on the claim that Officer Bauman acted willfully and wantonly in failing to secure the home after the search, and

that they are entitled to judgment as a matter of law. Hence, the Defendants' Motion for Summary

Judgment [# 38] is DENIED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 4/16/10